May it please the Court, Kirby Wilcox for United Parcel Service. We reserve eight minutes of our time for rebuttal. All right. Your Honor, I'd like to turn my initial remarks to the decertification order by the trial judge. And there's a very telling exchange after literally months of briefing and hearings and conferences on the subject of trial management and class certification, when the Court, while discussing with plaintiff how best to proceed to trial, raised the question whether or not all of the class members could be called or should be called to testify. Let me just ask you a quick question here, counsel. I assume that UPS was in favor of Judge Pragerson's ruling on the class decertification. Am I misunderstanding? No, absolutely. What are you arguing about? We know that this is the cross appeal, Your Honor. I'm happy to turn to you. Oh, I see. So you're anticipating the argument of the other side. Absolutely. I apologize. I didn't understand. No, if I – I thought you wanted the judge to reverse this ruling. No, Your Honor. Thank you for that clarification. And in response to whether or not all class members should be called, plaintiff's counsel responded, that's fine, at excerpt of record – supplemental excerpt of record 546. But the district court said, well, then I might as well try each and every case if that's fine. But it's not fine. And that telling exchange crystallizes exactly the problem that the district court faced. When a record indicates that there is competing individual testimony regarding critical issues in a case, a class is not appropriate unless a plaintiff can show that those issues are susceptible to common proof. And there's two perfect examples from the record, one having to do with the 50 percent test and one having to do with discretion and independent judgment. The 50 percent test is that aspect of the executive exemption or any exemption in California in which a plaintiff must establish common proof that there is a way to look at whether or not the members of the class spent more than 50 percent of their time engaged in exempt duties. And what the parties had was a problem for the trial court. Plaintiff, on the one hand, produced declarations saying that the members of the class performed their duties according to a recipe, according to a cookbook. And by definition, none of their time was exempt. And United Parcel Service put in counter evidence indicating that there were individuals who had spent more than 50 percent of their time engaged in exempt duties. So you have individual issues on both sides of that ledger. Same thing for discretion and independent judgment. Individualized testimony from plaintiff that the members of the class, those members of the class, don't exercise discretion. Individualized testimony from United Parcel Service that they do. How can you glue that together? It's not fine that everybody testifies. So the court asked plaintiff's counsel to produce some form of common proof, some evidence that these seeming individual issues were susceptible to common proof. With respect, counsel, that's all been very well briefed, I think, by both parties. And when Judge Dean Preggerson denies a class, you have to figure that he's paid very close attention to it. And I guess I'd like to move over on the UBS side of things. I'd like to understand more about your argument about why you were entitled to a JMOL on the issues of executive exemption with respect to the HUB supervisor position and, indeed, all of these positions. Because as I see it, you've got a jury instruction with respect to each issue, and I've got listed in my notes here a testimony that supported the jury's verdict with respect to each of those items. On what basis are you entitled to a JMOL? Let me start with the HUB supervisor position. And in that instance, Your Honor, we're only looking at one element, which is whether or not the plaintiff managed a subdivision with a continuing function. There is no clearer record than the one here where we're talking about a physical structure, two football fields in size, where there are machines and belts and physical spots on the floor where the work of the operation is performed. Literally, the testimony shows, and I have excerpts of record for Your Honor, we have the same supervisor managing the same employees in the same function in the same spot every single day. So we do have a location that is immovable and physical on the floor of the HUB. But I understand that on that issue of SER 138 and 235, there was testimony to the jury that Marlowe worked in different locations and facilities and was assigned different responsibilities during different work shifts. Why couldn't the jury have given credence to that? Because the testimony isn't an indication that he had an unspecified unit with unspecified employees. The Court has put its finger on the confusion that the jury asked the judge, which I will come to. In a simple case, Mr. Marlowe would have managed a single function on the floor of the HUB. But some of the locations on the floor of the HUB that have their own work groups are manageable by one supervisor. So Mr. Marlowe, in fact, at various points in time, had a work group in location number one and a work group in location number two. That doesn't mean that there isn't a location. It doesn't mean that there isn't a unit. I appreciate that. I guess what I'm struggling with here is when I look at jury instruction number five, it seems pretty standard. You apparently agreed to it. I don't think you objected to number five, did you? I don't recall having objected to number five, Your Honor. I'm not going to bother you with reading my notes about these things that would support the testimony, that would support the jury's verdict. But that's the role of the jury. The jury decides who it believes. You obviously are very capable counsel. You put on your testimony, and the jury heard both sides, and the jury didn't agree with you on this point. So I understand why you don't agree with the jury and why you feel that the jury perhaps was in error. But I'm not understanding in this HUB supervisor position or the other ones why you're entitled to a JMOL. Because the record evidence is clear that the jury could not have reached a conclusion other than that Mr. Marlowe supervised a unit. Where there is no dispute that these are physical locations, where there's no dispute, and I have excerpts of records for each of these verbs, Your Honor, that he monitored, that he directed, that he staffed, that he scheduled. Therefore, there's no dispute that he managed a work group. The only thing – Let me give you – we'll just take this one little piece here because I'm really interested in your – Please. There's one for each one of the positions here. But we already talked about he worked in different locations. There's testimony that Marlowe did not set or adjust rates of pay or set employees' working hours. That's S.E.R. 30. HUB managers do not negotiate contracts on behalf of UPS or create budgets for their centers. S.E.R. 37, 38. Marlowe did not have input into UPS's policies, procedures, or methods, conduct research on behalf of UPS, represent UPS in any functions, or plan work for UPS operations. That's S.E.R. 57 through 58. HUB supervisors reported to the HUB manager, and the HUB manager was in charge of and responsible for the HUB operation. That's S.E.R. 119, 120. The HUB manager assigned HUB supervisors to work with hourly employees or part-time supervisors 45 minutes out of every hour. I'm almost done. S.E.R. 253. And Marlowe's performance was graded on the HUB operation as a whole and not on performance results for employees. That's S.E.R. 126 through 130 and so on. Now there's similar detail with respect to every one of these jury findings, and although I appreciate the fine lawyering that your firm is doing on this, I just don't understand. You don't agree with the jury verdict, I understand it, but I don't see what's missing here. The jury heard evidence just to all these things. It credited it, and you lost on those points. Why should we be saying that the district court abused its discretion by denying NJMOL? Because I believe that the excerpts of record or the supplemental excerpts of record that your Honor cited go to whether or not the person was engaged in exempt duties or whether they were. That's part of it. I mean, as I said, we have similar kinds of testimony as to every one of the subcategories. I only picked that one because I don't want to bore you with all the rest of it. Well, but, Your Honor, I think it's important. In other words, the jury answered that question. They said, we find that they were managerial duties. The thing that we don't find is on your last question where you believe there was confusion. That is a single place. The jury asked a question during their deliberations regarding whether or not to satisfy the customarily recognized subdivision that it was limited, whether or not that test was limited to a subdivision. They asked the question in the singular. We can't know, but there appears to have been confusion because the testimony was that Mr. Marlow was a manager of more than one unit, more than one subdivision at a time. And the jury came back on this exemption with a ruling against United Parcel Service on the one element as to which it had asked a question and which the evidence showed. We clearly tell from the jury's answers that they were finding that in whatever location he was involved, he was involved in managerial duties as opposed to helping on the line, sort the packages. What in the jury's answers or the separate interrogatories would lead us to the conclusion that the jury was definitely saying, wherever they were, they were managerial duties. And our only lack of a finding here for this exemption is separate places. Because, Your Honor, the other elements of the exemption are ones on which United Parcel Service prevailed, that they engaged in exempt duties, which are managerial duties, more than 50 percent of the time, and that in the performance of those managerial duties, they customarily and regularly exercised discretion and independent judgment. Under latitude, however, in those answers for us to conclude that the jury said, well, in one subdivision, it wasn't more than 50 percent of the time. Isn't that a rational interpretation of the jury's answers? The testimony and the excerpts of record don't indicate. I'm talking about the jury answers. The jury didn't have in the record any indication to distinguish the type of managerial duties performed on one belt versus a second belt versus another location. I guess we just have to answer that for ourselves. The jury, the way the questions were phrased to the jury and their responses lead us inexorably to the conclusion that the jury said it was more than 51 percent managerial wherever it was located and the only confusion was one or more subdivisions. I think that what happens is when you get to the subdivision where the only inquiry is, did Mr. Marlowe manage a unit, just those two issues, it seems absolutely clear from the other determinations that he managed. And because the unit is a physical spot on the floor where sorting operations are performed, it is by definition a subdivision with a continuing function in the enterprise. So it seems, given how clear the other determinations were, that it's not possible on this record to reach any conclusion that the physical spot where he supervised a work group is a spot where continuing functions of the enterprise are performed. We do, I think we're maybe addressing the exact same issue. All of the signs point from the other determinations to satisfaction of the management piece. The only question is, is that a physical spot on the floor where continuing functions are performed? They're immovable. They're inflexible. You're down to five minutes and 16 seconds. Did you want to save it for responding? If the time showing on the clock is not inclusive of the eight minutes? It's not. You've used 15 minutes almost. I will reserve for comment. Thank you, Your Honor. May it please the Court. John Furratone on behalf of appellant or appellee and appellant Mr. Marlowe. Mr. Peters, my colleague, is going to be arguing on the attorney's fees issue. We would also like to reserve four times on rebuttal on the decertification issue, Your Honor. The time there is your total time. So however you use it. Understood. Understood, Your Honor. With regard to the first element in the HUB supervisor position, the standard was are you a manager or are you a supervisor? And the jury instruction was very clear. It said you have to be more than merely a supervisor. You have to be in charge of the operation. And the testimony elicited by Mr. Dunkel, who was the actual HUB manager, made it very clear. He was in charge. Mr. Marlowe was nothing but a supervisor. And that's why the jury came back to what it did. But regardless, there's substantial evidence to support the jury's verdict. And we're not challenging that. And, again, there's multiple witnesses testified, multiple documents testified to support the jury's verdict. How do you answer that same question that he attempted to answer? Are we not led to an inexorable conclusion from the jury's other answers? That they found he was serving in a managerial capacity for more than 51 to 50 percent of the time. Their only confusion was the only element that they would not apply to give him the exemption was simply one or more subdivisions. I think it's totally inerrant. I think that's a red herring, number one. The 51 percent element on the primarily engaged, that's an entirely separate element. I think what Mr. Wilcox is doing, he's trying to conflate the two. The jury made a finding on that, didn't they? They did. They did. And how did they find? What they found is that he spent more than 50 percent of his time performing exempt duties. Not managerial. There's an entirely different standard for what managerial duties are. And how so? Because exempt duties are specifically defined in the Code of Federal Regulations as if you audit, this is an exempt duty. If you train, that's an exempt duty. That doesn't necessarily mean it's managerial duties. They're entirely separate. The element is you have to spend 50 percent or more of your time doing exempt duties. So an exempt duty can clearly be a non-managerial one. So you can't say they're the exact same thing. What's the difference, though? So if the jury said more than 50 percent of the time on exempt duties and their only negative answer was on one or one subdivision, why aren't we led to the conclusion that they were confused? And the district court refused to clarify their confusion. Your Honor, the issue that the jury wrote was what is management? The funny thing is that special verdict question was in special verdict question two, 17 and 32. Now, they ruled in favor of Mr. Marlow on number two. They ruled against him on 17 and 32 because it was a different position. But the jury instruction for that question is to be, to qualify and to satisfy this element, you have to be more than merely a supervisor. You have to be in charge of a recognized unit. And I think where the jury came in based on Mr. Dunkel's testimony as well as based on Mr. Marlow's testimony, based on Mr. Wang's testimony and the other supervisor's testimony is that Mr. Marlow was nothing but a supervisor. When he went to the next day error operation, Mr. Dunkel was supervising him, micromanaging him, looking over his shoulder, telling him what to do. When he was on the floor, what was Mr. Dunkel doing? He's monitoring everyone. He's patrolling, making sure everyone did everything. So it showed that Mr. Marlow was not more than merely a supervisor. All he was was a supervisor. And I think that's where the jury came down on that decision. I don't think it came down to one or more. And I think the fact, if you try to speculate as to what the jury's intent, I think we need to understand the context. The jury came with their note within three hours of being handed the deliberation. And what Judge Gregerson said is, look, you're early on. I don't want them coming back to me. And he explained this in the order denying the JMLL. And it was the proper decision. Two days later, after three full days of deliberation, the jury comes back with their verdict. We don't know what the jury came down to. I do know one thing, though. When this same question is asked for the hub, the preload, and the on-road supervisor positions, they clearly stated in the hub position that Mr. Marlow was nothing but a supervisor. He did not manage a recognized unit. But they found it for the other two positions. So I don't think the refusal to give the jury instruction had any instruction. I think they really found their way. And we'd be speculating to say otherwise. With regard to the decertification issue, last year this circuit came out with the Wells Fargo home mortgage overtime consolidation cases, as well as Vanol. And what they did is basically they said the decision in the Wang v. Chinese Daily News was wrong. You have to have structure. You have to have centralized policies. You have to have centralized procedures. If you have that, that is sufficient common proof to support a class. And then if you omit certain factors, it's an abuse of discretion. Well, guess what? We did provide this. This litigation was going on for six years. In the certification stage, in opposing multiple summary judgments, and in bringing summary judgments ourselves, we presented facts showing common evidence.  The GAN chart is a chart that UPS prepares, which specifies in every ten-minute increment the responsibility of the full-time preload supervisor. It tells them what to do, when to do it, and how long to spend on each duty. It tells them when to take a break. It tells them that their day should be nine hours and ten minutes long. It tells them when to start. It tells them where to stop. This is common proof. This does tell you on a uniform basis what a preload supervisor is supposed to do and when to do it. And we believe that this is why the jury found that there was no discretion in independent judgment, because this form dictated exactly what they were supposed to do. We also presented at the certification stage, in opposition to multiple summary judgments, and in support of multiple summary judgments, the preload supervisor, and onward supervisor job breakdown analysis forms. These also are comprehensive procedures which tell each supervisor what to do when they arrive. What's your first step? This is what you do. You walk the docks. You walk the belt. This is your next act. After that, you do this. After that, you do this. You greet your employees. It can tell you what to do through your entire day. So these are the common proof. But more importantly, UPS gave us a discovery response, which we submitted, and was submitted in opposition to all the motions for summary judgment, which was submitted for the motion for certification, which says if the supervisors do not perform pursuant to the expectations outlined in UPS's job descriptions and job duties, they're guilty of misperformance. So what does that mean? It means that these documents, these JBAs and these GAMT charts, are the universe for what these people are supposed to do. It tells them precisely what to do. It tells them when to do it. It tells them how to do it. That in itself is common proof. Now, the trial court, when it issued its order of decertification, it said all we have is the Wang versus Chinese daily news standard. You have individual testimony and a blanket exemption policy. That was wrong. That was an abuse of discretion because the trial court omitted the factors of the GAMT chart and omitted the factor of the job rate analysis form. It omitted the specific checklists and the methods that these people are supposed to follow, the uniform checklist which these supervisors are supposed to use when they audit these employees, the checklist which they're supposed to do as they perform their duties on a daily basis. This was the common proof that was there, which the trial court completely omits in its decertification order. Mr. Wilcox hinted at one thing. He started off his argument by saying that in an exchange with Judge Pryorson, we said that's fine in regards to the number of people you're going to bring in. The records doesn't show what the inflection was. Mr. Peters was exasperated when he said that. But isn't that an indication that individuals would have to give testimony in order to ascertain the damages, and isn't that the very opposite of what a class action is supposed to do? Actually, it's not, because you can bifurcate the issues. What all parties did is they had to. But you're not required to in making the assessment as to whether or not class action is the most efficient way to resolve the case. But what the plaintiff did, Your Honor, and what the defendant also did, is they had surveys done, and our economists actually, we did surveys which were mailed out, which everyone analyzed how much time people spent, what their overtime amounts were, whether they took rest breaks or not. And our economists actually broke down them individually by these people. Is that survey the one that was rejected by the court? That was not the survey. This is our economist survey by Dr. Phil Allman. And that was comprehensive, and he did it for all 1,300 class members. He calculated individual damages. So we could have got that testimony in through Mr. Allman, because all the parties agreed that the forms submitted by the 700 class members were adequate. So as to the damage. How did the district court resolve the proffer of that evidence? They ignored it. The district court completely ignored it. In fact, when you look at the transcript of the hearing on decertification, it completely contradicts what the actual order is. Judge Ferguson's order is that we stated that we would rely heavily on the Mary Spain survey. What we told him is the Spain survey doesn't matter. We don't need it. We're relying on the testimony of the industrial engineering district manager. We're going to rely on the testimony of the division managers of UPS and the managers, as well as the Gantt charts and the JBAs, the job breakdown analysis. And did you say you were going to rely on the survey from the economists as well? It wasn't addressed, but that was we had already approached him in a status conference about that, Your Honor. But how could the district court ignore something that wasn't even addressed? Well, we had discussed it previously. But when you're having a hearing, this is your opportunity to convince the judge that he should not decertify the class. So if that's your most powerful piece of evidence in terms of the damages, why wouldn't you point the judge to that? Because what the judge was looking for was do we have common evidence of what these supervisors actually do? And that's what the focus was in the decertification hearing. So our focus was on showing him that we were going to rely on the supervisors of the job breakdown analysis forms and the Gantt charts, as well as the testimony from the managers and, more importantly, the industrial engineering manager to testify regarding it. Okay. So what was his reaction to those proffered documents? He ignored it, again. He ignored everything and just made a decision based on thin air? With regard to that, he came back to us, well, what about the survey? And we said, well, we're not really relying on the survey. In fact, we can throw it out. Was this on the record? It was on the record, and it was in the transcript. And, in fact, I spent 23 pages explaining how we were going to proceed through trial using the testimony of the industrial engineering managers, as well as the Gantt chart and the JBAs. So, Your Honor, I'm down to eight minutes, slightly under nine minutes. I'd like to turn it over to Mr. Peters. Thank you. Good morning, Your Honors. Mark Peters, co-counsel for Mr. Marlowe. I'm going to address the attorney's fees. Give us some context. What's the total award exclusive of the attorney fees? Just under $250,000. And the award is a million what?  And, of course, there's some allegation in the briefs that the judge appropriately eliminated the class certification time. But to help us a little bit more with context, what was eliminated in reaching a million-some-odd attorney's fees relative to a $200,000, $250,000 award? Well, Judge Pragerson went through and eliminated all the work that was done on the class certification. How much was the total request for? Out of a million-some-odd that was awarded, how much was the total request? Well, the total request was 3.7. The load star was 3.7 originally that we submitted. So he reduced the 3.7 down to ultimately to 1.4. He redid his calculations at page 27 and 28 of his order. You'll see where he went. And he cut the hours for the class certification work, the motions for summary judgment on the class certification, the appeal of those motions for summary judgment to this court. And so he cut it down to the 1.4. And then with, I think, to some degree a concern about proportionality, he cut another $300,000 down to end up at the 1.17, basically. And he addressed those, you know, again, I believe it's page 27 and 28 of his order. My concern, I guess, is that the 1.1 something is very large in relation to the $250,000, and I certainly respect the proportionality reduction. The risk here, of course, is that so many of those hours that he didn't eliminate are really joint hours. When he's talking, when you're talking in the briefs, in the arguments, in the motions, about some of the issues that pertain to this individual plaintiff, you're also addressing, by necessity, many of the class questions, certification questions, and you're addressing it in the context of trying to convince the court that certification of the class is appropriate. So that's the risk, and my question is whether he made enough of a reduction to take that mix into account. Oh, I think he absolutely did, Your Honor, because by eliminating all the class certification work, all the motions for summary judgment around that work, he eliminated the vast majority of the work that was truly devoted to the class issues. As Judge Pregerson talks about in his 44-page opinion, there are a lot of novel and complicated issues in this case that were, would have had to have been litigated and were litigated in Mr. Marla's individual case and in the class case. So, if anything, I think there's a good argument to be made that he probably overcut our hours based on having to do the work on some of these somewhat complicated and novel wage and hour issues that were in the trial anyway, and I would point out that he cut a lot of the discovery as well, the depositions that we took. Basically, your answer is it would have required this no matter what. A million some odd in hours would have been fully warranted and required to produce that $250,000 verdict. Absolutely, Your Honor. This was a six-year litigation odyssey against UPS and Paul Hastings. Judge Pregerson goes through in his 44-page order and talks about the vehemence with which this case has been litigated, the complicated issues that have been addressed, as well as then at trial. You know, we used, we put on the stand between us and UPS every witness that was deposed in the underlying class action, and then he cut, they got to take, I think, 25 or actually I think it ended up being close to 40 depositions of class members. We didn't recover for any of that time. I mean, he cut out, we ended up getting 31% roughly of the hours that we put into this case, and I think that's a good and accurate representation of what happened, and I would go back to the important public policy behind wage and hour laws, and I understand there's a concern with proportionality. Judge Pregerson addressed that in his order as well, but these cases are not going to be taken by attorneys if they can't be paid their attorney's fees. This is an unusual case, a $250,000 verdict, but remember, that covered nine years of overtime and rest and meal break. That's an unusually high verdict, actually, in an individual's wage and hour case. Those cases will not be taken by competent attorneys if they're not going to be paid their attorney's fees, and that's highlighted in the Bell and the Gentry cases that we cited in our brief, and the importance of paying those attorney's fees to make sure that the important public policies behind those labor code provisions are enforced. I see I'm down to three minutes. I think I need to reserve that for everybody. All right. Thank you. Briefly, with respect to the hub and preload positions, opposing counsel has attempted to distinguish the term manager from the term supervisor, but the controlling regulations from the preload position from 29 CFR 541.102 under the heading management use the terms management and supervision interchangeably. There is no site in any case in the history of California wage and hour law distinguishing manager from supervisor within that regulation. None. They are equivalents. Therefore, when the jury found that Mr. Marlowe spent more than 51 percent of his time engaged in management duties. Or non-exempt duties. He spent more than. What was the finding? I'm sorry. What was the actual finding from the jury? That Mr. Marlowe spent more than 51 percent of his time engaged in exempt duties, and the exempt duties for the executive exemption are management duties. He didn't really label it manager, supervisor or anything, right? No, Your Honor. Nor could there be that distinction. Those terms are equivalent in that controlling regulation. Therefore, when they reached that determination, they found that he managed, and all we needed to do was. . . Well, they found that he engaged in exempt duties. Well, but the exempt duties are management duties. There has to be symmetry. And if that's the case, then the jury could only have been confused with regard to a unit, because there's the physical spot that he managed, and they found that he managed it. So it would seem that a new trial, at the very least, would be warranted here, given that confusion. And in the preload, we think that there's plenty of record excerpts to support a JMOL, but I would like to focus on the new trial, because it's a really, really interesting issue. Mr. Marlowe's deposition occurred many years before the trial, and 17 months of his preload time followed the deposition. And in a trial of someone's exempt status, one has to look at whether they exercise discretion and independent judgment, but it's not observed.  What choices am I making between the arguments that I'd like to present to you and not present to you? What happens in the exercise of discretion and independent judgment to be proven by a defendant is there have to be identified options, and we have to identify choices made among them. But those are decisions that are made in Mr. Marlowe's mind. And in the preload, we lost on discretion and independent judgment and had no opportunity to explore what is the engine of the law, which is... Do you want to address the cost appeal at all? The cost appeal on the... Attorney's fees. On the attorney's fees, Your Honor, we feel that we have fully briefed and fully support what we understand to be the concerns behind the questioning, which is that after six years of litigation, but only one year devoted to taking the individual case to trial, to try to recover for six years of work on what was a one-year effort is outsized. And we, in our brief, argued for a further reduction, not an unfair reduction. What we have been asked to pay in fees are fees generated to litigate the class case, and we don't believe that that's fair. Finally, Your Honor, with regard to the issue of whether or not the district judge ignored testimony, in his order at excerpt of record 310, strike that 311, plaintiff has submitted samples of UPS's standardized procedures, including UPS's job breakdown analysis. And he goes on and on and lists all of the items that opposing counsel indicated to you were ignored. That's literally encompassed within the judge's order. Furthermore, to give you a sense of how carefully the judge explored this evidence, with regard to JBAs, which were represented to this court as uniform, a straitjacket, at excerpt of record 957, Mr. Marlow was asked whether or not the JBA, in fact, was comprehensive. And the question was, so not everything is in the JBA that you do as a full-time supervisor. Answer, no, I don't think so. So they're not comprehensive. Further, the JBA specifically contemplates individualized judgments. It uses the phrase that you need to make on-the-spot judgments, at excerpt of record 958. So when asked, question, and the judgment would be how to handle the situation in each case, the uniqueness of it, the individualness of it, answer, there would need to be judgments made on what to do, yes. So not only did the court not ignore any one of these pieces of evidence, the court struggled to determine whether any one of them could be common proof for class determination, and the court concluded that they could not. All right. Thank you, counsel. Rebuttal on the cross-appeal only. Thank you, Your Honor. With regard, Your Honor, to the decertification order. The decertification order, Mr. Wilcox is correct. It does state in one brief line that plaintiff has submitted certain documents. But on page 21 of the decertification order, Judge Ferguson said that plaintiff's evidence is essentially individual testimony and an exemption policy. That's the reason why he decertified this case. In doing so, he, again, ignores the JBAs and the GAN chart and the common proof that's in front of him. If he says he's considered everything, he doesn't necessarily have to check off in his analysis every single item that's been offered, does he? When you say that, when you quote, plaintiff's evidence is essentially individual testimony and an exemption policy, that is plainly wrong. That doesn't mean he didn't look at the other documents, right? It does give you an indication that it does, because this falls under the Wang v. Chinese Daily News rationale, which this court has rejected last year, which says that all you have is a blanket exemption policy. That's what that sentence is. Basically, he's saying, you know, he didn't feel that it was that compelling. That doesn't mean he ignored it, but he just didn't carry the day with it. You may have thought that it was compelling, but obviously he didn't share that view. That doesn't mean he ignored it, though. But I think then that you go into step three, which is the abuse of discretion prong under the test shown in the Vanol case, which is then you're giving an improper weighing of the relevant factors. All he's saying, again, is he's basing it on a survey and individual testimony and this blanket exemption policy, and basically ignoring the substantive evidence that's in front of him.  That's an abuse of discretion. The other thing that he also did is he, without any authority, he reversed the burden. In the Savon court in 2004, the California Supreme Court made clear that in a class action case, on an exemption issue such as this, in an overtime case, it's the defendant that carries the burden. He didn't reverse the burden on the, it's the person, the group that's seeking class certification has the burden of establishing that this is an appropriate case. And so he did not reverse the burden on the exemption. He bifurcated the burden shifting, the burden. I think he went further. I think he said that we had to prove the burden under our Rule 23 analysis, but at trial it would be our burden as the class to carry the, to show that the exemption is wrong when it's actually in California law. But that doesn't matter if he's talking about the trial. At this point he's talking about the decertification. And he articulated the proper burden at that point. But his decertification order goes further than that. And basically he's weighing the merits. And he says basically at trial, without this common proof, you guys can't get where you need to go. And I think that's part of the problem with this order. But he has to look at, I mean, as part of determining whether or not the class is the preferred method, he has to look at, okay, at trial, how will this, how will the proof come in? How will it be managed? So it's not inappropriate for a district court judge when making a Rule 23 certification or decertification decision to look forward to see how the, that's the whole point of the Rule 23 analysis, is to see whether or not the trial would be more efficient if you do it as a class. I understand and I agree with you. However, when you exclude certain competent evidence, which was proven at trial to be pretty darn compelling, such as the Gantt charts, such as the JBAs, again, and you don't put that into the mix, I think that's an abuse of discretion and I think that's what happened here. All right. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. That completes our calendar for today. We'll be in recess until 9 a.m. tomorrow morning. Thank you.
judges: Jones, Rawlinson, Smith M.